*PRELIMINARY PRINT*

VOLUME 601 U. S. PART 2
PAGES 294–329

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

APRIL 16, 2024

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# RUDISILL *v.* McDONOUGH, SECRETARY OF VETERANS AFFAIRS

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 22–888. Argued November 8, 2023—Decided April 16, 2024

Since World War II, the Federal Government has provided educational assistance to servicemembers with qualifying service through various GI bills. Typically, GI bills provide 36 months of educational benefits each up to a cap of 48 months in cases where servicemembers become eligible for benefits under more than one GI bill. See 38 U. S. C. §3695(a). This case concerns two GI bills with overlapping service periods—the Montgomery GI Bill Act of 1984 (covering service between 1985 and 2030) and the Post-9/11 Veterans Educational Assistance Act of 2008 (covering service on or after September 11, 2001).

Petitioner James Rudisill enlisted in the United States Army in 2000 and served a total of eight years over three separate periods of military service. He became entitled to Montgomery Bill benefits as a result of his first period of service. Rudisill earned an undergraduate degree and used 25 months and 14 days of Montgomery benefits to finance his education. Through his subsequent periods of service, Rudisill also became entitled to more generous educational benefits under the Post-9/11 GI Bill. Rudisill sought to use his Post-9/11 benefits to finance a graduate degree. Rudisill understood that such benefits would be limited to 22 months and 16 days under §3695's 48-month aggregate-benefits cap. But the Government informed Rudisill that he was only eligible for 10 months and 16 days of Post-9/11 benefits (the length of his unused Montgomery benefits) due to §3327, a provision in the Post-9/11 Bill designed to coordinate benefits for those servicemembers meeting the criteria for both Montgomery benefits and Post-9/11 benefits. Section 3327 provides that a servicemember meeting the criteria for both GI bills can elect to swap Montgomery benefits for the more generous Post-9/11 benefits, up to a total of 36 months of benefits. §3327(d)(2)(A). Ultimately, the Federal Circuit, sitting en banc, sided with the Government, explaining that when Rudisill sought to use his Post-9/11 benefits, he had made an "election" under §3327(a)(1) to swap his Montgomery benefits for Post 9/11 benefits, making his benefits subject to §3327(d)(2)'s 36-month limit.

*Held*: Servicemembers who, through separate periods of service, accrue educational benefits under both the Montgomery and Post-9/11 GI Bills

may use either one, in any order, up to §3695(a)'s 48-month aggregate-benefits cap.   Pp. 305–314.

   (a) The Government claims that someone in Rudisill's position is subject to §3322(d)'s mandatory coordination clause, so, to receive *any* Post-9/11 benefits, he must make an election under §3327(a), which in turn subjects him to §3327(d)(2)'s 36-month benefit limit.   Rudisill counters that §3322(d) does not apply to him because he has earned two separate entitlements to benefits.   Rudisill further maintains that §3327(a)'s election mechanism is optional in any event, and that he does not forfeit any entitlement by declining to make a §3327(a) election.

   The statutory text resolves this case in Rudisill's favor.   Rudisill earned two separate entitlements to educational benefits, one per the Montgomery GI Bill and the other per the Post-9/11 GI Bill, by serving in the military for nearly eight years over three separate periods.   Focusing on these two separate benefits entitlements—rather than on his periods of service—leads to two relevant observations about the statute.   First, the statute establishes a baseline rule that, absent some other limitation, the VA "shall pay" a veteran's benefits.   §§3014(a), 3313(a).   Second, Congress has plainly delineated certain durational limits on these benefits entitlements; *i. e.*, each program entitles the recipient to up to 36 months of benefits, and both are subject to §3695's 48-month aggregate-benefits cap.   §§3013(a)(1), 3312(a).   Rudisill is thus separately entitled to each of two educational benefits, and absent specified limits, the VA is statutorily obligated to pay him 48 months of benefits.   Pp. 305–306.

   (b) Section 3322(d), which creates a mechanism for certain service-members to "coordinate" their benefits, does not limit Rudisill's entitlement.   First, nothing in the statute imposes a duty for any veteran to "coordinate" entitlements in order to receive benefits.   Section 3322(d) does not mention the receipt of benefits but addresses instead the "coordination of entitlement."   Because Rudisill is already entitled to two separate benefits, he has no need to coordinate any entitlement under §3327.   As used in the statute, the word "coordination" denotes a swap. Section 3327, to which §3322(d) points, describes coordination as making an election that permits the individual to get Post-9/11 benefits "instead of" Montgomery benefits.   §3327(d)(1).

   There are two additional clues that §3322(d) does not address a veteran who just wants to use one of his two separate entitlements.   First, §3322—titled "Bar to duplication" of benefits—does not speak to someone who has earned each benefit separately and is asking to receive each benefit separately.   Second, §3322(d) applies to individuals with Montgomery entitlements "as of August 1, 2009," the effective date of the Post-9/11 GI Bill.   Before that date, individuals could have been

accruing Post-9/11 benefits (ever since September 11, 2001) but would have had no way to opt into a benefits program that was not enacted until 2008. The swap Congress devised in §3327 gives such individuals a mechanism for accessing these benefits. Pp. 307–310.

(c) The contention that Rudisill can only use his Post-9/11 benefits by invoking §3327 is contradicted by that provision's text. Pp. 310–314.

(1) To start, an election under §3327(a) is optional, *i. e.*, an individual "*may* elect to receive" Post-9/11 benefits. And a decision not to make a §3327(a) election does not purport to alter one's entitlement. To argue that Rudisill may receive Post-9/11 benefits only by making a §3327(a) election is to misread §3322(a) as imposing a substantive requirement to elect benefits via §3327(a). The two elections are different. While §3322(a) requires Rudisill to elect which benefit to receive at any particular time, it does not follow that he must also make an election under §3327(a) to swap out his benefits. And it is noteworthy that §3322(a) does not mention, much less cross-reference, *either* §3322(d) *or* §3327. Other parts of the statute confirm that not all elections are the same. Compare §3322(a) with §3322(h); §3327(a) with §3327(c)(1). In the context of a statute that establishes multiple distinct elections, attempts to equate a §3322(a) election with a §3327(a) election are unpersuasive. Pp. 310–312.

(2) The plain text of §3327(d) makes clear that §3327(d)—which details the consequences of making an election under §3327(a)—does not limit a servicemember in Rudisill's situation. One such consequence is that a §3327 election entitles an individual to Post-9/11 benefits *instead of* basic Montgomery benefits. But Rudisill was entitled to both benefits, and he had no need to swap one set of benefits for another. A second consequence of a §3327 election is that "the number of months of [Post-9/11 benefits] shall be . . . the number of months of unused [Montgomery benefits], as of the date of the election." §3327(d)(2)(A). Like subsection (d)(1), this provision only relates to an individual making a §3327(a) election. This makes perfect sense under Rudisill's reading of the statute, but would be nonsensical under the Government's view, as it would impose an exhaust-or-forfeit requirement for veterans with two separate entitlements. The more sensible view is that §3327(d)(2) is a limit on exceeding one's entitlement through the swapping mechanism §3327 creates. Pp. 312–314.

55 F. 4th 879, reversed and remanded.

JACKSON, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. KAVANAUGH, J., filed a concurring opinion, in which BARRETT, J.,

joined, *post*, p. 314.   THOMAS, J., filed a dissenting opinion, in which ALITO, J., joined, *post*, p. 319.

*Misha Tseytlin* argued the cause for petitioner.   With him on the briefs were *Sean T. H. Dutton, Kevin M. LeRoy, Timothy L. McHugh,* and *David J. DePippo.*

*Vivek Suri* argued the cause for respondent.   With him on the brief were *Solicitor General Prelogar, Principal Deputy Assistant Attorney General Boynton, Deputy Solicitor General Stewart,* and *Galina I. Fomenkova.**

———————

*Briefs of *amici curiae* urging reversal were filed for the Commonwealth of Virginia et al. by *Jason S. Miyares,* Attorney General of Virginia, *Andrew N. Ferguson,* Solicitor General, *Erika L. Maley,* Principal Deputy Solicitor General, *Kevin M. Gallagher,* Deputy Solicitor General, and *Rick W. Eberstadt,* Assistant Solicitor General, by *Angela Colmenero,* Provisional Attorney General of Texas, and by the Attorneys General for their respective jurisdictions as follows: *Steve Marshall* of Alabama, *Kristin K. Mayes* of Arizona, *Tim Griffin* of Arkansas, *Rob Bonta* of California, *Philip J. Weiser* of Colorado, *William Tong* of Connecticut, *Kathleen Jennings* of Delaware, *Brian L. Schwalb* of the District of Columbia, *Ashley Moody* of Florida, *Christopher M. Carr* of Georgia, *Raúl R. Labrador* of Idaho, *Kwame Raoul* of Illinois, *Brenna Bird* of Iowa, *Daniel Cameron* of Kentucky, *Jeff Landry* of Louisiana, *Aaron M. Frey* of Maine, *Anthony G. Brown* of Maryland, *Andrea Joy Campbell* of Massachusetts, *Keith Ellison* of Minnesota, *Lynn Fitch* of Mississippi, *Austin Knudsen* of Montana, *Aaron D. Ford* of Nevada, *Matthew J. Platkin* of New Jersey, *Raúl Torrez* of New Mexico, *Letitia James* of New York, *Joshua Stein* of North Carolina, *Edward E. Manibusan* of the Northern Mariana Islands, *Gentner F. Drummond* of Oklahoma, *Ellen F. Rosenblum* of Oregon, *Michelle A. Henry* of Pennsylvania, *Peter F. Neronha* of Rhode Island, *Alan Wilson* of South Carolina, *Marty J. Jackley* of South Dakota, *Jonathan Skrmetti* of Tennessee, *Sean D. Reyes* of Utah, *Charity R. Clark* of Vermont, *Robert W. Ferguson* of Washington, *Patrick Morrisey* of West Virginia, *Joshua L. Kaul* of Wisconsin, and *Bridget Hill* of Wyoming; for the American Legion by *Glenn R. Bergmann, Thomas M. Polseno,* and *James D. Ridgway*; for the Edison Electric Institute et al. by *Elbert Lin*; for Iraq and Afghanistan Veterans of America by *Adam G. Unikowsky* and *Michelle S. Kallen*; for Military-Veterans Advocacy, Inc., by *Melanie L. Bostwick* and *John B. Wells*; for the National Institute of Military Justice by *Juan O. Perla* and *T. Barry Kingham*; for the National Veterans Legal Services Program et al. by *Michael E. Kenneally*; for the Veterans of

JUSTICE JACKSON delivered the opinion of the Court.

Petitioner James Rudisill first enlisted in the United States Army in the year 2000. Over the next decade, he reenlisted twice, serving a total of eight years on active duty. As a result of his first period of military service, Rudisill was entitled to 36 months of educational benefits under the Montgomery GI Bill, to be paid by the Department of Veterans Affairs (VA). Rudisill's subsequent periods of service separately entitled him to 36 months of educational benefits under the Post-9/11 GI Bill. Both of Rudisill's entitlements were subject to a 48-month aggregate-benefits cap.

Rudisill used 25 months and 14 days of his Montgomery benefits to help fund his undergraduate degree. Then, after serving his third tour of duty, Rudisill sought to use his Post-9/11 benefits to attend divinity school.

The VA informed Rudisill that his Post-9/11 benefits were limited to the duration of his unused Montgomery benefits, pursuant to a provision of the Post-9/11 GI Bill, 38 U. S. C. § 3327(d)(2). In other words, according to the VA, by requesting Post-9/11 benefits before exhausting all of his Montgomery benefits, Rudisill could receive only 36 months of benefits in total, not the 48 months to which he would otherwise be entitled.

The question before us is whether Rudisill can access his Post-9/11 benefits entitlement without being subject to § 3327(d)(2)'s durational limit. We hold that he can. Because he simply seeks to use one of his two separate entitlements, § 3327(d)(2) does not apply.

I

A

"The United States has a proud history of offering educational assistance to millions of veterans, as demonstrated by

Foreign Wars of the United States by *Rex W. Manning*; for Jeremy C. Doerre, *pro se*; for Sen. Tim Kaine et al. by *Roman Martinez*; and for 10 Veterans by *Matthew A. Fitzgerald* and *R. Andrew Austria*.

the many 'G.I. Bills' enacted since World War II." Post-9/11 Veterans Educational Assistance Act of 2008, § 5002(3), 122 Stat. 2358, 38 U. S. C. § 3301 *et seq.* GI bills honor the sacrifices of those who have served in the military, and as such, "ha[ve] a positive effect on recruitment for the Armed Forces." *Ibid.* These education benefits have also helped to "reduce the costs of war, assist veterans in readjusting to civilian life after wartime service, and boost the United States economy." *Ibid.*

In the more than 75 years since Congress passed the first GI Bill in response to World War II, it has enacted additional GI bills, most of which share two relevant features. First, an individual with the requisite period of military service becomes "entitled to" educational benefits, typically in the form of a stipend or tuition payments, which the VA is then required to provide once the veteran enrolls in an eligible education program. Servicemen's Readjustment Act of 1944, 58 Stat. 288, 289; see also, *e. g.*, Veterans' Readjustment Assistance Act of 1952, 66 Stat. 664–666; Veterans' Readjustment Benefits Act of 1966, 80 Stat. 13, 15. Second, with one brief exception,[1] GI bills from the Korean War onward have provided education benefits to fully qualified servicemembers for a fixed duration: 36 months of benefits per GI bill, up to a total of 48 months of benefits for those servicemembers who become eligible for educational benefits under multiple GI bills. See 66 Stat. 665; 82 Stat. 1331; 90 Stat. 2396.[2]

This case relates to the overlap between two recent GI bills. The first is the Montgomery GI Bill Act of 1984, 38 U. S. C. § 3001 *et seq.* The Montgomery GI Bill provides "[b]asic educational assistance" to servicemembers who first enter active duty between 1985 and 2030. § 3011(a). Montgomery benefits give veterans a "basic educational assist-

---

[1] Veterans' Readjustment Benefits Act of 1966, 80 Stat. 14.

[2] Congress has amended this provision over the years, but the statutory language has remained largely the same, and the 48-month aggregate cap has not varied. 38 U. S. C. § 3695(a).

ance allowance" that "help[s] meet, in part, the expenses of such individual's subsistence, tuition, fees, supplies, books, equipment, and other educational costs." § 3014(a); see also § 3015 (setting forth amount of assistance). This limited stipend ordinarily does not pay the full costs of a veteran's education.

As with other GI bills, the Montgomery GI Bill consists of a detailed series of statutory provisions that include an entitlement and also durational limits. To be "entitled to basic educational assistance" under the Montgomery benefits program, a servicemember must satisfy certain military service requirements—typically two or three years of continuous active duty. § 3011(a). The servicemember is then "entitled to 36 months" of Montgomery benefits. §§ 3013(a)(1), (c)(1). An eligible servicemember "may make an election *not* to receive [Montgomery benefits]," § 3011(c)(1) (emphasis added), but unless he opts out, he contributes $1,200 into the program, usually through a series of pay reductions. §§ 3011(b)(1)–(2). The Montgomery Bill's 36-month entitlement is also "[s]ubject to section 3695," § 3013(a)(1), a provision that predates Montgomery and limits "[t]he aggregate period for which any person may receive assistance under two or more [GI bills]" to 48 months, § 3695(a).

The second GI bill at issue in this case is the Post-9/11 Veterans Educational Assistance Act of 2008, 122 Stat. 2357, 38 U. S. C. § 3301 *et seq.* When it enacted this bill, Congress expressly recognized that "[s]ervice on active duty in the Armed Forces has been especially arduous . . . since September 11, 2001," and that the Montgomery GI Bill's modest educational benefits, which were "designed for peacetime service," had become "outmoded." §§ 5002(2), (4), 122 Stat. 2358. Therefore, the Post-9/11 GI Bill gives servicemembers "enhanced educational assistance benefits" that "are commensurate with the educational assistance benefits provided by a

grateful Nation to veterans of World War II." §5002(6), *ibid.* A servicemember entitled to Post-9/11 benefits ordinarily receives the actual net cost of in-state tuition, additional public-private cost sharing to cover the cost at private institutions, a monthly housing stipend, a lump sum for books and supplies, and additional amounts for other specified expenses. 38 U. S. C. §§3313(c), 3315–3318.

As with the Montgomery GI Bill, the Post-9/11 GI Bill establishes an entitlement and also prescribes durational limits. To be entitled to Post-9/11 benefits, servicemembers must typically serve on active duty in the Armed Forces for at least three years starting on or after September 11, 2001. §3311(b). "[A]n individual entitled to educational assistance under [the Post-9/11 GI Bill] is entitled to . . . 36 months" of enhanced educational benefits. §3312(a). And as with Montgomery benefits, this entitlement is "[s]ubject to section 3695," *ibid.*, meaning that a servicemember's aggregate benefits from the Post-9/11 GI Bill and other GI bills are capped at 48 months, see §3695(a).

Because the Montgomery and Post-9/11 bills cover overlapping service periods, eligibility for benefits under these two bills overlaps as well. Consequently, the Post-9/11 GI Bill contains a provision titled "[b]ar to duplication of educational assistance benefits." §3322. This bar clarifies that an individual with entitlements to both Montgomery and Post-9/11 benefits "may not receive assistance under two or more such programs concurrently, but shall elect . . . under which chapter or provisions to receive educational assistance." §3322(a). A later enacted provision further ensures that an individual may not receive double credit for a single period of service; rather, he "shall elect . . . under which authority such service is to be credited." §3322(h)(1).

Thus, to summarize: Per §3322, servicemembers who are eligible for educational benefits under either the Montgomery GI Bill or the Post-9/11 GI Bill—from a period of service

that could qualify for either program—can opt to credit that service toward one educational benefits program or the other. If servicemembers serve for long enough, they may be entitled to both. But such servicemembers cannot receive disbursements from both entitlement programs at the same time, nor may they receive any combination of benefits for longer than 48 months. Outside of those limitations, their service "entitle[s]" them to the benefits that they have earned, and the VA "shall pay" them these benefits. §§ 3011(a), 3014(a), 3311(a), 3313(a).

B

When it enacted the Post-9/11 GI Bill, Congress addressed one immediate problem that arose due to the lag time between the start of the Post-9/11 GI Bill's entitlement period and the bill's effective date. The case before us concerns the scope of that solution.

As we have explained, the Post-9/11 GI Bill created an educational benefits entitlement for veterans who serve on or after September 11, 2001. But the legislation granting that entitlement was not passed until 2008 and did not take effect until August 1, 2009. See 122 Stat. 2378. Thus, servicemembers who were entitled to Post-9/11 benefits but had been funneled through the Montgomery program until the Post-9/11 GI Bill went into effect needed a way to access the more generous Post-9/11 benefits program.

Section 3322(d) informs these servicemembers that "coordination of entitlement to educational assistance under [the Post-9/11 GI Bill], on the one hand, and [the Montgomery GI Bill] on the other, shall be governed by [§ 3327]." Then, under § 3327, an individual who meets the criteria for Montgomery benefits and Post-9/11 benefits based on the same (overlapping) period of service can elect to exchange the Montgomery benefits he has received for the Post-9/11 benefits that he wants. Section 3327(a) states that "[a]n individual may elect to receive educational assistance under [the

Post-9/11 GI Bill]" if they meet two criteria. First, they must fall into one of six categories "as of August 1, 2009," including, as relevant here, individuals who are "entitled to [Montgomery benefits]." §§ 3327(a)(1)(A), (C). Second, they must "mee[t] the requirements for entitlement to [Post-9/11 benefits]" "as of the date of the" § 3327(a) election. § 3327(a)(2).

Making a § 3327(a) election effects a swap by operation of § 3327(d): "[A]n individual making an election under [§ 3327(a)] shall be entitled to [Post-9/11 benefits], instead of [Montgomery benefits]." § 3327(d)(1). And, notably, the statute further clarifies that, if the individual has already used some Montgomery benefits when he makes that swap, the new entitlement is not a full 36 months of Post-9/11 benefits. Instead, his new entitlement capped at "the number of months of unused entitlement . . . under [the Montgomery GI Bill], as of the date of the election." § 3327(d)(2)(A). Once a servicemember elects to swap his Montgomery benefits entitlement for a Post-9/11 benefits entitlement, that "election . . . is irrevocable." § 3327(i).

## II

Petitioner James Rudisill spent nearly eight years on active duty in the U. S. Army, providing three distinct periods of military service.[3] He was deployed to Iraq and Afghanistan, experienced combat, and sustained multiple injuries. He reached the rank of captain and earned several medals and commendations, including a Bronze Star. After each period of service, Rudisill received an honorable discharge.

In between his second and third periods of military service, Rudisill earned an undergraduate degree. To help finance this education, he used 25 months and 14 days of the Montgomery benefits he was entitled to receive due to his

---

[3] Rudisill's first period of service was from January 2000 to June 2002; his second and third periods of service were from June 2004 to December 2005, and November 2007 to August 2011, respectively.

first period of service. After graduating in 2007, he reen-rolled in the Army for a third period. By 2015, Rudisill successfully sought admission to Yale Divinity School; he intended to earn and use that degree to become a chaplain in the Army.

To fund his graduate school education, Rudisill applied to the VA for Post-9/11 benefits, relying on the entitlement that he had earned with respect to his second and third periods of service. But the VA issued a certificate of eligibility stating that Rudisill was only eligible for 10 months and 16 days of Post-9/11 benefits—the length of his unused Montgomery benefits. This response did not accord with Rudisill's understanding of the scope of his entitlement: In his view, he had earned an entitlement to 36 months of Post-9/11 benefits based on his second and third periods of service, and he could use 22 months and 16 days of that Post-9/11 entitlement due to § 3695's 48-month aggregate-benefits cap. Rudisill filed a notice of disagreement with the VA, which eventually denied his claim for the additional entitlement.

The Board of Veterans' Appeals affirmed the VA's decision, but the Court of Appeals for Veterans Claims reversed. It reasoned that although the statutory scheme was ambiguous, the statutory structure, regulatory framework, congressional purpose, and pro-veteran canon supported Rudisill's interpretation of the statute. *BO* v. *Wilkie*, 31 Vet. App. 321 (2019).

Over a dissent, a panel of the Federal Circuit agreed, holding that veterans with multiple periods of qualifying service are not subject to § 3327(d)(2). 4 F. 4th 1297 (2021). The en banc Federal Circuit then considered the matter, and, overruling the panel in a 10-to-2 decision, it reversed. 55 F. 4th 879 (2022). It explained that, when Rudisill sought to use his Post-9/11 benefits, he had made an "election" under § 3327(a)(1), making his benefits subject to § 3327(d)(2)'s limit.

We granted certiorari and now reverse the judgment of the Federal Circuit. 599 U. S. —— (2023).

### III

The question before us is this: When servicemembers have separate entitlements to both Montgomery and Post-9/11 benefits, can they use their benefits, in any order, up to § 3695's aggregate 48-month cap?    In the Government's telling, a veteran in this position is subject to § 3322(d)'s mandatory coordination clause; to receive *any* Post-9/11 benefits, he must make an election under § 3327(a), which subjects him to § 3327(d)(2).    By contrast, Rudisill argues that he already has two separate entitlements to benefits—36 months under each program—so § 3322(d) does not apply to him.    And, even if it did, Rudisill says, § 3327(a)'s election mechanism is optional, and he does not forfeit any entitlement by declining to make a § 3327(a) election.

As explained below, the pertinent statutory text resolves this dispute in Rudisill's favor.    Section 3327(d)(2)'s limit applies only to an individual who makes a § 3327(a) election. But Rudisill never made an election under § 3327(a), nor must he have done so, because § 3327 is triggered only if a servicemember is "coordinat[ing]" an entitlement per § 3322(d). Someone in Rudisill's situation—who just uses one of his two entitlements—is not coordinating anything.    This view is further reinforced by our reading of § 3327(a).    That provision's election mechanism is optional, and Rudisill does not forfeit his entitlements by declining to make a § 3327(a) election.

### A

We start by examining Rudisill's benefits entitlements generally.    It is undisputed that Rudisill earned two separate entitlements to educational benefits due to the length of his military service.    Based on his first period of service, he became "entitled to" Montgomery benefits, as the statute clearly states.    § 3011(a).    Equally clear is that his second and third periods of service "entitled" him to Post-9/11 benefits.    § 3311(a).

So, from the outset, we know that Rudisill earned two separate benefits entitlements, one per the Montgomery GI Bill and the other per the Post-9/11 GI Bill, by serving in the military for nearly eight years over three separate periods. Notably, our analysis does not focus on his periods of service. Contra, *post*, at 325 (THOMAS, J., dissenting). Rather, what matters is that his lengthy service conferred two separate entitlements.

Recognizing Rudisill's separate entitlements leads us to two observations. First, the statute establishes a baseline rule that, absent some other limitation, the VA must pay a veteran's benefits. The Montgomery GI Bill requires that "[t]he Secretary *shall pay* to each individual entitled to [Montgomery benefits] who is pursuing an approved program of education a basic educational assistance allowance." §3014(a) (emphasis added). Likewise, the Post-9/11 GI Bill states that "[t]he Secretary *shall pay* to each individual entitled to [Post-9/11 benefits] who is pursuing an approved program of education . . . the amounts specified." §3313(a) (emphasis added).

Second, Congress has clearly and plainly delineated certain durational limits on these benefits entitlements. Montgomery and Post-9/11 entitlements have specified outer limits: Each program entitles the recipient to up to 36 months of benefits, and both are "[s]ubject to section 3695," which imposes a 48-month aggregate-benefits cap. §§3013(a)(1), 3312(a). The benefits entitlements are likewise qualified by certain enumerated exceptions. *Ibid.*

Thus, even before turning to the statutory provisions that are most directly implicated here, it is clear that (1) Rudisill is separately entitled to each of two educational benefits; and (2) absent specified limits, the VA is statutorily obligated to pay him 48 months of benefits. As explained below, no statutory constraint prevents Rudisill from accessing his benefits, up to 48 months, in whichever order he chooses.

## B

Section 3322(d) is the first of two statutory provisions that are at the heart of this dispute. That subsection, titled "Additional coordination matters," states:

> "In the case of an individual entitled to educational assistance under [the Montgomery GI Bill or other specified programs], or making contributions toward [the Montgomery Program], as of August 1, 2009, coordination of entitlement to educational assistance under [the Post-9/11 GI Bill], on the one hand, and such chapters or provisions, on the other, shall be governed by [38 U. S. C. § 3327]."

There is no dispute that subsection (d) applies to a servicemember who is entitled to Montgomery benefits but has become eligible for Post-9/11 benefits for his period of qualifying service as of August 1, 2009, given the overlap of those two entitlement programs. See Part I–B, *supra.* But in the context of the instant dispute, the Government argues, and the dissent echoes, that an individual who has two separate benefits entitlements under the Montgomery and Post-9/11 bills must also "coordinate" those two entitlements under § 3322(d) in order to access his Post-9/11 benefits. We conclude that the plain text of § 3322(d) does not support that assertion.

First, nothing in the statute imposes a duty for any veteran to "coordinate" entitlements in order to receive benefits. Sections 3011 through 3014, which outline the Montgomery entitlement, do not refer to coordination. Nor do §§ 3311 through 3313, which establish the Post-9/11 benefits entitlement. And § 3695—the provision that specifically addresses veterans with more than one entitlement—does not require, or even mention, coordination.

For the person covered by § 3322(d)'s coordination requirement, the provision does discuss "coordination of entitle-

ment" to benefits. But the statute distinguishes between "entitlement to" and "receipt of" benefits. For example, §§ 3322(e), (f), and (g) bar duplicative *receipt* of benefits. Similarly, § 3322(a) says that a servicemember "may not receive" two benefits at the same time. But § 3322(d) does not concern the *receipt* of benefits—that term appears nowhere in that subsection. Instead, subsection (d) addresses "coordination of entitlement." Rudisill has no need to coordinate any entitlement: He is *already* entitled to two separate benefits. Section 3322(d) says that "coordination of entitlement . . . shall be governed by" § 3327, but, as Rudisill correctly observes, with nothing to coordinate, § 3327 does not govern.

Both the Government and the dissent argue that this view misconstrues the meaning of the term "coordination." In their view, "coordinat[ing]" an entitlement is not converting or exchanging entitlements. But what, then, does it mean to coordinate an entitlement under this statutory scheme? They contend that coordination "refers to a veteran choosing which 'entitlement' . . . he would like to use." *Post*, at 323 (opinion of THOMAS, J.). But choosing an entitlement is an election, not coordination. And the statute uses the word "elect" repeatedly to say that veterans should choose between two different entitlements. Here, § 3322(d) speaks of "coordination," not "election," and we generally "presume differences in language like this convey differences in meaning." *Henson* v. *Santander Consumer USA Inc.*, 582 U. S. 79, 86 (2017).

Nor does the reference to "coordination" in subsection (d) exist in isolation. Rather, subsection (d) points to § 3327, which—as we explain below, see Part III–C–2, *infra*—tells us what coordination means: making an election that permits the individual to get Post-9/11 benefits "instead of" Montgomery benefits. § 3327(d)(1). In ordinary parlance, if a person who is directed to "coordinate" receives one thing "instead of" another, that "coordination" is understood to effect a swap.

Opinion of the Court

If we were left with any doubt that § 3322(d) simply does not speak to a veteran who just wants to use one of his two separate entitlements, two additional clues would tip the balance. First, § 3322 is titled "Bar to duplication" of benefits. There is no duplication for someone in Rudisill's situation. He earned each benefit separately, and he is asking to receive each benefit separately. "[S]ection headings . . . 'supply cues' as to what Congress intended," *Merit Management Group, LP* v. *FTI Consulting, Inc.*, 583 U. S. 366, 380 (2018), and § 3322's heading tells us that its provisions prevent double dipping, something that Rudisill is not doing.

Second, § 3322(d) applies to individuals with Montgomery entitlements "as of August 1, 2009." The Government says that this language just references the bill's effective date. See Brief for Respondent 16, and n. But, in the entire Post-9/11 GI Bill, only two statutory provisions—§ 3322(d) and § 3327(a)(1)—specifically reference this date. Why would Congress refer to the effective date of the Post-9/11 GI Bill in only these two places and nowhere else?

The most logical inference is that this date is material to the work of those particular provisions. And under the interpretation we adopt today, August 1, 2009, is highly relevant, because before then, individuals could have been accruing Post-9/11 benefits (ever since September 11, 2001) but would have had no way to opt into that benefits program. The swap Congress devised in § 3327 gives such individuals a mechanism for accessing these benefits. The invocation of the bill's effective date in § 3322(d) thus provides another clue that these provisions are not relevant to someone, like Rudisill, who has no need to make a swap.[4]

Adding all this up, we come to the conclusion that § 3322(d) serves a specific function: to allow individuals with Montgomery benefits who would prefer to swap them for Post-

---

[4] To be clear, as both parties agree, the August 1, 2009, effective date does not *limit* servicemembers' ability to use § 3327's election mechanism to swap benefits earned after this date.

9/11 benefits to "coordinate" these entitlements via § 3327. But when a person already has two separate entitlements and simply *uses* one after the other, he is not coordinating anything. Because that is Rudisill's situation, § 3322(d) does not speak to him.

C

Based on the analysis we have already laid out, Rudisill never reaches § 3327 when using his benefits because he is not coordinating his entitlements. And the contention that Rudisill can only use his Post-9/11 benefits by invoking § 3327 is contradicted by the text of § 3327 itself.

1

We cannot agree that, to receive Post-9/11 benefits, a servicemember in Rudisill's situation must elect them via § 3327. The statute simply does not say that a servicemember with more than one entitlement receives Post-9/11 benefits only by making a § 3327(a) election.

To start, a § 3327(a) election is optional: An eligible individual "*may* elect to receive" Post-9/11 benefits. "'[T]he "word 'may' *clearly* connotes discretion."'" *Opati* v. *Republic of Sudan*, 590 U. S. 418, 428 (2020). So a veteran can opt for a § 3327(a) election, but he does not have to.

If he decides not to opt for a § 3327(a) election, nothing in § 3327, § 3322, or anywhere else purports to alter his entitlement. Instead, the veteran remains in the exact same position as before. A veteran who had only Montgomery benefits is left with only Montgomery benefits. Likewise, for the veteran (like Rudisill) who started out with both Montgomery and Post-9/11 benefits, both sets of benefits remain.

To argue that Rudisill may receive Post-9/11 benefits only by making a § 3327(a) election, the dissent invokes—and misreads—§ 3322(a). See *post*, at 322–323 (opinion of THOMAS, J.). To repeat, as relevant here, § 3322(a) provides: "An individual entitled to [Post-9/11 benefits] who is also eligible for [Montgomery benefits] may not receive assistance under [both] programs concurrently, but shall elect . . . under

which chapter or provisions to receive educational assistance." As is clear from its text, §3322(a) just says, and means, that a veteran cannot use Montgomery and Post-9/11 benefits at the same time to fund his education. Section 3322(a) bars double dipping—it does not impose a substantive requirement to elect benefits via §3327(a).

So, while Rudisill must make an election per §3322(a) when he wants to have a particular aspect of his education funded, it does not follow that he must also make an election under §3327(a). The two elections are completely different, and making one is not the same as making the other. By blurring all elections into one, instead of recognizing that the statute contemplates multiple distinct elections, the Government—and the dissent—make a crucial misstep.

In this regard, it is noteworthy that §3322(a) does not mention, much less cross-reference, *either* §3322(d) *or* §3327. Even though §3322(a) and §3327(a) both use the word "elect," nothing in the text of either provision suggests that these two elections are one and the same. Rather, to "elect" just means to choose. See New Oxford American Dictionary 545 (2d ed. 2005) ("elect" means to "opt for or choose to do something"). And that says nothing about the substance of any option.

Other parts of the statute confirm that not all elections are the same. For example, §3322(a) requires a person with two or more entitlements to "elect" which to receive at any given time, while §3322(h) bars "duplication of eligibility based on a single event or period of service," and thus requires certain individuals to "elect" under which benefits programs their service is to be credited.[5] Turning to §3327, subsection (a) similarly allows a person who is entitled to Montgomery benefits to "elect" to receive Post-9/11 benefits

---

[5] In all, 38 U. S. C. §3322 has six separate subsections that require different elections. See §§3322(a), (c), (e), (g), (h)(1), (2). Neither the Government nor the dissent offers a compelling reason as to why, out of all six provisions, §3322(a) requires "coordination" under §3322(d) and an "election" under §3327(a).

under certain circumstances, and subsection (c)(1) lets a person "elect" to revoke an entitlement that he previously transferred. Furthermore and importantly, subsection (i) refers to these two elections separately. See § 3327(i) ("An election under subsection (a) or (c)(1) is irrevocable"). In the context of a statute that establishes multiple distinct elections, attempts to equate a § 3322(a) election with a § 3327(a) election are unpersuasive.

2

Undeterred, the Government turns to § 3327(d), which details the consequences of making an election under § 3327(a). But the plain text of § 3327(d) makes clear that the provision does not limit a servicemember in Rudisill's situation.

From its start, § 3327(d) contradicts the Government's reading of the statute. Section 3327(d)(1) tells us that "an individual making an election under [§ 3327(a)] shall be entitled to [Post-9/11 benefits] *instead of* basic [Montgomery benefits]." § 3327(d)(1) (emphasis added). In other words, he swaps out his entitlement to Montgomery benefits for an entitlement to Post-9/11 benefits. Rudisill had no need to get Post-9/11 benefits "instead of" Montgomery benefits, because he was already entitled to both benefits.

For veterans who have used some but not all of their Montgomery benefits, § 3327(d)(2)(A) lays out one further consequence of making a § 3327 election: When these veterans "mak[e] an election under [§ 3327(a)], the number of months of [Post-9/11 benefits] shall be . . . the number of months of unused [Montgomery benefits], as of the date of the election." Two aspects of this provision stand out.

First, like subsection (d)(1), this limitation only applies to "an individual making an election under subsection (a)." So, if a person does not make a § 3327(a) election, § 3327(d)(2) does not limit his entitlement.

Second, this provision makes perfect sense under Rudisill's interpretation of the statute. If a veteran served for three years, he earned 36 months of benefits. If he received Mont-

gomery benefits for this service but should have been able to get Post-9/11 benefits, due to the overlap in the eligibility for these programs, § 3327 lets him opt for Post-9/11 benefits instead. But if he has already used some benefits at the time he elects the swap, a § 3327(a) election does not entitle him to a full 36-month period of Post-9/11 benefits in addition to the Montgomery benefits he has already used. Instead, § 3327(d)(2) ensures that his one period of service entitles him to 36 months of educational benefits in total—no more, and no less.

By contrast, § 3327(d)(2) is nonsensical under the Government's view of the statute. It would impose an exhaust-or-forfeit requirement for veterans with two separate entitlements: Either use up all of your Montgomery benefits (so that you can get your full 48 months of benefits), or lose any entitlement in excess of 36 months.[6] At the very least, this would be an odd way to create an exhaustion requirement, and the Government has not pointed us to any comparable one in this statutory scheme or elsewhere. Again, the more sensible view—and the view that the statutory text best supports—is that § 3327(d)(2) is a limit on exceeding one's entitlement through the swapping mechanism § 3327 creates, and is thus not an exhaustion requirement at all.

In sum, § 3327(a)'s election mechanism is an optional means of trading an existing benefits entitlement for Post-9/11 benefits. Although § 3327 details the consequences of making that election, those consequences—by their own terms—apply only to an individual who makes a § 3327(a) election.

―――――――――

[6] Consider, for example, a veteran who has used 24 months of Montgomery benefits and also has an entitlement to 36 months of Post-9/11 benefits. Under the Government's reading, if she uses up her last 12 months of Montgomery benefits, she could then get 12 months of Post-9/11 benefits (48 months in total benefits). But if she wants to immediately start using her Post-9/11 benefits entitlement without using up all the Montgomery entitlement, she could get only 12 months of Post-9/11 benefits, and nothing more (adding up to 36 months in total).

On the other hand, the entitlements of a person who does not make a §3327(a) election are not altered.   In Rudisill's case, that leaves him with two different entitlements (one under the Montgomery GI Bill and the other under the Post-9/11 GI Bill) that the VA "shall pay" to him, subject only to §3695's 48-month cap.    §§3014(a), 3313(a).

\*          \*          \*

The bottom line is this: Veterans who separately accrue benefits under both the Montgomery and Post-9/11 GI Bills are entitled to both benefits.   Neither §3322(d) nor §3327 restrict veterans with two separate entitlements who simply seek to use either one.   Thus, Rudisill may use his benefits, in any order, up to §3695's 48-month aggregate-benefits cap. If the statute were ambiguous, the pro-veteran canon would favor Rudisill, but the statute is clear, so we resolve this case based on statutory text alone.   Because the Federal Circuit incorrectly limited Rudisill's benefits, we reverse its judgment and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KAVANAUGH, with whom JUSTICE BARRETT joins, concurring.

I agree with the Court that the post-9/11 education-benefits law entitles James Rudisill, a military veteran, to additional benefits for graduate school.   The Court goes on to say that the clarity of the benefits law at issue here means that we need not rely on the veterans canon of statutory interpretation.   I again agree.   I write separately, however, to note some practical and constitutional questions about the justifications for a benefits-related canon (such as the veterans canon) that favors one particular group over others.

Under the veterans canon, statutes that provide benefits to veterans are to be construed "in the veteran's favor." *Brown* v. *Gardner*, 513 U. S. 115, 118 (1994).   The veterans

canon is a substantive canon of statutory interpretation. A substantive canon is a judicial presumption in favor of or against a particular substantive outcome. Some classic examples include the presumption against retroactivity, the presumption against extraterritoriality, and the presumption of mens rea.

Applying a substantive canon, a court may depart from what the court, absent the canon, would have concluded is the best reading of the statutory text. Otherwise, of course, the substantive canon would not be necessary or relevant. See J. Manning & M. Stephenson, Legislation and Regulation 383 (4th ed. 2021) (In "order for a substantive canon" to "do any work, it must be the case that in the absence of the canon the court would have reached a different conclusion").

Substantive canons are typically based on background constitutional principles or long-settled judicial understandings of congressional practice. See *id.*, at 382–384. Because a substantive canon by definition has important decision-altering effects, any substantive canon must be sufficiently rooted in constitutional principles or congressional practices.

Here, no one suggests that the veterans canon rests on background constitutional principles. Rather, the canon seems to stem from a loose judicial assumption about congressional intent—in particular, an assumption that Congress intends for courts to read ambiguous veterans-benefits statutes more broadly than the courts otherwise would read such statutes. See *Boone* v. *Lightner*, 319 U. S. 561, 575 (1943).

But what is that assumption based on? The Court has never explained.

The first glimmerings of the veterans canon appeared in the 1940s. See *ibid.* But the early cases did not purport to establish a canon. They seem to have simply engaged in broadly purposive interpretation of the particular statutes at issue. Since those early cases, the Court has occasionally referred to a general pro-veterans interpretive principle,

but without further explanation. See, *e. g.*, *Henderson* v. *Shinseki*, 562 U. S. 428, 441 (2011); *King* v. *St. Vincent's Hospital*, 502 U. S. 215, 220–221, n. 9 (1991). The canon appears to have developed almost by accident.

Moreover, the veterans canon has apparently not mattered—in other words, has not affected the result—in any of this Court's past decisions in veterans cases, or in this case for that matter. See, *e. g.*, *Henderson*, 562 U. S., at 441; *Brown*, 513 U. S., at 117–118; *King*, 502 U. S., at 220–221, n. 9; see also *Kisor* v. *McDonough*, 995 F. 3d 1347, 1350 (CA Fed. 2021) (Prost, C. J., concurring in denial of rehearing en banc). The Court has "rarely" applied the veterans canon. *Id.*, at 1350. And even when mentioned, the canon has seemingly served only as the proverbial icing on a cake already frosted—that is, an extra citation after the Court has already concluded that the veteran prevails anyway under the statutory text and traditional tools of statutory interpretation.

Despite the canon's seemingly nonexistent impact on this Court's decisions, the Court's reflexive repetition of the canon over the years has created the appearance of deeper rooting, leading lower courts—particularly the Federal Circuit where veterans benefits cases are channeled—to rely on the canon in a way that this Court has not. Compare *id.*, at 1350–1358 with *id.*, at 1366–1374 (O'Malley, J., dissenting from denial of rehearing en banc). But this Court's repetition of the canon has not yielded any greater justification or explanation by the Court for applying such a canon in the first place.

In considering whether a sufficient justification exists, we must confront some fundamental problems with benefits-related canons like this one.

To begin with, the notion that benefits statutes should be interpreted to favor a particular group creates significant tension with the actual operation of the process by which Congress and the President enact spending laws. To be sure, if someone asked a Member of Congress or the Presi-

dent (or this judge, for that matter) in the abstract, "Should veterans get more benefits?" the answer would be yes. But that question is not (and cannot be) answered in the abstract. The spending process is a zero-sum game, where money spent on one group means less money for other groups and other national priorities.

Would Congress prefer to pay for another semester of veterans' graduate-school educations, or instead for more Pell Grants for lower-income college students? Would Congress want to spend more on healthcare benefits for the disabled, or instead on prescription-drug benefits for senior citizens? Would Congress choose to increase the pension benefits of retired CIA agents, or instead the wages of soldiers who are serving in harm's way today? The list of difficult choices goes on and on. National security, assistance to the poor, law enforcement, energy production, environmental protection, border security, cancer research, housing aid, highway construction, airplane safety, school lunches, disaster relief, drug treatment, prisons, and a plethora of other national priorities all compete for funding in the legislative process. And the U. S. Treasury is not a bottomless well of free money—rather, the money comes primarily from the taxes paid by the American people.

The spending process in Congress requires hard choices with painful tradeoffs. Judges have no principled way to make those choices or weigh those tradeoffs. Nor do judges have a principled way, other than reading the statutory text as written, to conclude that Congress and the President would prefer to favor one group over another—or stated another way in this zero-sum process, to disfavor one group over another.

In addition to that practical problem, judges have no constitutional authority to favor or disfavor one group over another in the spending process. Rather, under the Constitution's separation of powers, Congress and the President make those policy judgments. See U. S. Const., Art. I, §7, cl. 2; §8, cl. 1; §9, cl. 7. Courts must then neutrally interpret

and apply the spending laws enacted by Congress and the President.  Courts do so by heeding the statutory text and employing the traditional tools of statutory interpretation—not by singling out particular groups for favored or disfavored treatment.  See A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 352–354 (2012).

For those reasons, courts interpreting spending laws usually do not apply canons to favor or disfavor particular groups.  Courts, for example, do not apply a low-income-families canon, a healthcare-for-seniors canon, or a local-law-enforcement canon to favor those groups.  (Nor, from the other direction, do courts apply a general fiscal-responsibility canon to narrowly construe spending statutes.)

In short, any canon that construes benefits statutes in favor of a particular group—rather than just construing the statutes as written—appears to be inconsistent both with actual congressional practice on spending laws and with the Judiciary's proper constitutional role in the federal spending process.

To be clear, Congress's commitment to assisting veterans through the many federal veterans-benefits programs is entirely appropriate given the sacrifices made by those who have served in the Armed Forces.  The statutes that provide significant veterans benefits—including healthcare, education, disability, and retirement benefits—properly assist those who have defended America.  And when statutes afford broad benefits for veterans or others, as is often the case, courts should apply the statutes as written.

But providing federal benefits—and determining their scope—is Congress's prerogative.  The Judiciary's role is to neutrally interpret those statutes, not to put a thumb on the scale in favor of or against any particular group.  For that reason, it may be important in a future case for this Court to address the justification for any benefits-related canon that favors one group over others.

JUSTICE THOMAS, with whom JUSTICE ALITO joins, dissenting.

Our country rewards those who serve in the Armed Forces with educational benefits. This case involves the educational benefits available under the Montgomery GI Bill and the more recent Post-9/11 GI Bill. The Post-9/11 benefits are more generous than the Montgomery benefits, and veterans are sometimes entitled to benefits under both programs. By statute, however, veterans cannot receive benefits under both programs at the same time. Congress therefore created an election mechanism that allows veterans to switch from Montgomery benefits to Post-9/11 benefits. Under that mechanism, when a veteran switches to Post-9/11 benefits after using some, but not all, of his Montgomery benefits, the amount of his Post-9/11 benefits is limited to the number of months he had remaining for Montgomery benefits. 38 U. S. C. §3327(d). The question here is whether this limitation applies to James Rudisill, a retired captain in the U. S. Army.

The Court agrees that Rudisill could not use his two sets of benefits concurrently, and that he switched to Post-9/11 benefits when he had some remaining Montgomery benefits. *Ante*, at 303–304, 310–311. But, it declines to apply the statute's corresponding limitation on his benefits because Rudisill was separately entitled to Montgomery and Post-9/11 benefits due to his multiple periods of service. *Ante*, at 298. Because this approach conflicts with the statute's plain text, I respectfully dissent.

I

Since World War II, Congress has enacted numerous statutes that provide veterans with a range of educational benefits, commonly called GI bills. Two of these statutes are at issue here: the Veterans' Educational Assistance Program Act of 1984 (Montgomery GI Bill), 38 U. S. C. §3001 *et seq.*, and the Post-9/11 Veterans Educational Assistance Act

(Post-9/11 GI Bill), 38 U. S. C. § 3301 *et seq.* As the majority explains, the Montgomery GI Bill had been the primary source of educational benefits since 1985, but, in direct response to the September 11, 2001, attacks and the ensuing conflict, Congress enacted the Post-9/11 GI Bill and made its benefits retroactively available. *Ante*, at 299–301. The Montgomery and Post-9/11 programs differ in meaningful ways. Montgomery benefits provide a modest, fixed monthly stipend, whereas Post-9/11 benefits are more generous and can cover the actual net cost of in-state tuition, along with other expenses such as tutorial assistance and licensing test fees. Compare, *e.g.*, § 3015 with §§ 3313–3315, 3317–3318.

Both programs impose a durational cap on the benefits that an individual may receive. Regardless of how long a veteran has served or how many periods of service he has, a qualifying veteran is generally eligible for a maximum of 36 months of benefits under each program. §§ 3013, 3312. In addition, there is an aggregate cap on benefits that applies across programs. No veteran may receive more than 48 months of educational benefits total. § 3695.

The two educational-benefit programs cover overlapping time periods. And, several statutory provisions address this overlap. No veteran can use the two sets of benefits concurrently. § 3322(a). Veterans accordingly must "elect" which benefits to receive at a specific time. *Ibid.* As relevant here, there is a condition attached to one particular election. Under § 3327, if a veteran elects to switch to Post-9/11 benefits when he "has used, but retains unused," Montgomery benefits, he is subject to a statutory "[l]imitation on entitlement." Under this limitation, the amount of his Post-9/11 benefits will be limited to "the number of months of unused entitlement of the individual under" the Montgomery program. § 3327(d)(2)(A).[1]

---

[1] There is another part of the limitation's formula that is of no concern in this case. Title 38 U. S. C. § 3327(d)(2)(B) encompasses "the number of months, if any, of entitlement revoked by the individual under subsection

The question before us is whether that statutory limitation applies to Rudisill's benefits. Rudisill served during three separate periods, spanning roughly eight years. He first enlisted in the Army in 2000 and served until 2002. During this period of service, Rudisill became eligible for Montgomery benefits. He used some of these benefits to start and, after a second period of service spanning about a year and a half, complete an undergraduate degree. Rudisill then rejoined the Army as a commissioned officer, serving from 2007 to 2011. Rudisill's second and third periods of service made him eligible for Post-9/11 benefits. After he completed his third period of military service, he was admitted to Yale Divinity School.

Rudisill sought to use his remaining benefits to fund his graduate education at Yale. At that time, Rudisill had used 25 months and 14 days of his Montgomery benefits for his undergraduate education. This left him with 10 months and 16 days of remaining Montgomery benefits. Rather than use these remaining benefits, however, Rudisill decided to switch to his Post-9/11 benefits. As part of that switch, Rudisill filled out a Department of Veterans Affairs (VA) form electing to receive Post-9/11 benefits "in lieu of" Montgomery benefits. App. 1a. He expressly acknowledged that his "months of entitlement under chapter 33"—*i. e.*, Post-9/11 benefits—would be "limited to the number of months of entitlement remaining under chapter 30"—*i. e.*, Montgomery benefits. *Ibid.*

Applying the limitation on entitlement in §3327, the VA awarded Rudisill Post-9/11 benefits for 10 months and 16 days—the amount he had remaining for his Montgomery benefits. Rudisill appealed, arguing that the §3327 limitation did not apply to him because he had separate entitlements to Montgomery and Post-9/11 benefits due to his multiple periods of service. Sitting en banc, the Federal Circuit

(c)(1)." This provision concerns a veteran's transfer of benefits to family members, which Rudisill has not done.

held that the VA had correctly applied the statutory limita-
tion to Rudisill's benefits.   I would affirm.

## II

Rudisill's Post-9/11 benefits are limited to the amount of
Montgomery benefits he had not used.   Because he could not
use his sets of benefits concurrently, the statute required
that Rudisill coordinate his entitlements, and that such coor-
dination would be governed by § 3327.   Rudisill then used
the election mechanism in § 3327 to switch to Post-9/11 bene-
fits after he had used some, but not all, of his Montgomery
benefits.   By making that election, the statute limited his
benefits to the amount of Montgomery benefits he had left.
Because the statutory scheme directs how a veteran in Rudi-
sill's position can switch to Post-9/11 benefits, I would apply
that mechanism to Rudisill's election—and the cost that
comes with it.

As an initial matter, there is no dispute that Rudisill can-
not use his Montgomery and Post-9/11 benefits concurrently.
See Brief for Petitioner 39–40; *ante*, at 310–311.   Under
§ 3322(a), a veteran "entitled to" Post-9/11 benefits "who is
also eligible" for Montgomery benefits "may not receive as-
sistance under two or more such programs concurrently, but
shall elect (in such form and manner as the Secretary may
prescribe) under which chapter or provisions to receive edu-
cational assistance."   Because Rudisill is entitled to Mont-
gomery and Post-9/11 benefits, he cannot receive both bene-
fits at the same time.   Instead, he "shall elect" which
benefits to receive.

How does Rudisill "elect" which benefits to receive?   That
is the core of the dispute in this case.   In my view, the stat-
ute answers that question by requiring Rudisill to coordinate
his entitlements and creating an election mechanism for him
to do so.   After barring the concurrent use of benefits in
§ 3322(a), Congress included a provision titled "[a]dditional
coordination matters" in subsection (d).   This coordination

provision states that "[i]n the case of" a veteran "entitled" to benefits under certain other chapters—including the Montgomery chapter—"coordination of entitlement to educational assistance under this [Post-9/11] chapter, on the one hand, and such chapters or provisions, on the other, shall be governed by [38 U. S. C. § 3327]."

The "coordination" here refers to a veteran choosing which "entitlement"—*i.e.*, set of benefits—he would like to use. The ordinary meaning of "coordination" is "[t]he action of arranging or placing in the same order, rank, or degree." 3 Oxford English Dictionary 898 (2d ed. 1989); see also Random House Dictionary of the English Language 447 (2d ed. 1987) (defining "coordinate" as "to place or arrange in proper order or position" and "to assume proper order or relation"); Webster's Third New International Dictionary 501–502 (1981) (defining "coordination" as "arrangement in the same order, class, rank, or dignity" and "coordinate" as "to make coordinate; put in the same order or rank"). In this context, coordination refers to a veteran ordering his sets of benefits. A veteran's entitlement to both Montgomery and Post-9/11 benefits necessarily requires "coordination" because he cannot use them concurrently, as subsection (a) prohibits such use. And, subsection (d) explains that such coordination "shall be governed" by § 3327.[2]

Unsurprisingly, the coordination provision points to an election mechanism. As relevant, under § 3327(a)(1), a veteran "may elect to receive educational assistance under this [Post-9/11] chapter" if he meets certain criteria. "[A]s of August 1, 2009," the veteran must be "entitled" to Montgomery benefits and "mee[t] the requirements for entitlement" to Post-9/11 benefits. §§ 3327(a)(1), (2). Next, a veteran may make this election to switch to Post-9/11 benefits if he "has

─────────

[2] Contrary to the Court's assertion, coordination and election are distinct acts. See *ante*, at 308. Coordination requires a veteran to choose which entitlement to use at any given time; an election is the mechanism by which he switches from one set of benefits to another.

used, but retains unused, entitlement under [the Montgomery] chapter." §3327(a)(1). Put more simply, this election mechanism applies to a veteran who is entitled to both Montgomery and Post-9/11 benefits and has used some, but not all, of his Montgomery benefits.

There is a consequence, however, for using this election mechanism. By making a §3327(a)(1) election, a veteran triggers a "[l]imitation on entitlement." §3327(d)(2). Under that limitation, the veteran's Post-9/11 benefits are limited to "the number of months of unused entitlement of the individual under [the Montgomery] chapter . . . as of the date of the election." §3327(d)(2)(A). That is, a veteran with remaining Montgomery benefits who elects to switch to his Post-9/11 benefits is limited to the amount of Montgomery benefits he has remaining.

Rudisill is covered by the election mechanism and its accompanying limitation. He is entitled to both Montgomery and Post-9/11 benefits. And, as of August 1, 2009, he had used, but retained unused, Montgomery benefits. Section 3327(a) therefore provided him a mechanism by which he could elect to switch to Post-9/11 benefits. And, Rudisill made that election. App. 1a ("By electing Chapter 33, I acknowledge that I understand . . . my months of entitlement under chapter 33 will be limited to the number of months of entitlement remaining under chapter 30"). Because Rudisill elected to switch to his Post-9/11 benefits before exhausting his Montgomery benefits, he was subject to the corresponding limitation on his entitlement: He could receive Post-9/11 benefits for only the months remaining on his Montgomery benefits. Indeed, the VA informed him of this consequence before he made his election, and Rudisill acknowledged it. See *ibid.* Applying this limitation, the en banc Federal Circuit correctly found that Rudisill was limited to 10 months and 16 days of Post-9/11 benefits for his graduate education. That straightforward conclusion follows from the statutory

scheme that Congress created. I would simply apply that statutory limit to Rudisill.

### III

Rudisill and the majority make various attempts at avoiding the statute's inevitable conclusion, but none hits the mark. That is in large part because the statute's text, though complicated, is ultimately unambiguous. Accordingly, they do not dispute that Rudisill earned entitlements to both Montgomery and Post-9/11 benefits and that he cannot use these entitlements concurrently. *Ante*, at 305–306, 310–311; Brief for Petitioner 25–26, 39–40. They do not dispute that he made an election to switch to Post-9/11 benefits. *Ante*, at 310; Brief for Petitioner 26–27; App. 1a. And, they do not dispute that, when he made that election, he had used, but retained unused, Montgomery benefits. *Ante*, at 304; Brief for Petitioner 26.

Instead, Rudisill's primary argument is that the specific provisions in the statute governing coordination and election do not apply to veterans who have multiple periods of service. But, Rudisill acknowledges that the text of § 3327(a) "does not state that its election mechanism is limited to veterans with only a single period of service." *Id.*, at 46. There is likewise no language in the coordination provision of § 3322(d) that plainly cabins its application based upon periods of service. Because the plain text contains no carveout based on periods of service, that should be the end of the debate.

Rudisill's contrary argument is especially unconvincing given that Congress included other period-of-service limitations in the very subchapter at issue. See *Rotkiske* v. *Klemm*, 589 U. S. 8, 14 (2019) ("Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision"). Congress provided that a "*period of service* counted for purposes . . . of an education loan under [a differ-

ent program] may not be counted as a *period of service* for
entitlement to educational assistance under this [Post-9/11]
chapter." § 3322(b) (emphasis added); see also § 3322(h) (cre-
ating a "[b]ar to duplication of eligibility based on a single
event or *period of service*" (emphasis added)). Congress
could have chosen to similarly limit the scope of § 3322's coor-
dination provision or § 3327's election mechanism based upon
periods of service or separate entitlements, but it did not.
We cannot do so of our own accord.

Next, Rudisill contends that the election mechanism in
§ 3327 is merely meant to provide veterans with a single pe-
riod of service a way to convert lesser Montgomery benefits
into more generous Post-9/11 benefits on a one-to-one basis.
The text of § 3327 makes clear, however, that it is a mecha-
nism for making an election to switch from Montgomery ben-
efits to Post-9/11 benefits—not merely a way to convert one
into the other. Section 3327 provides how a veteran "may
elect to receive" Post-9/11 benefits instead of his Montgom-
ery benefits. And, it echoes § 3322(a)'s requirement that a
veteran entitled to multiple sets of benefits "shall elect"
which benefits to receive because he cannot use them concur-
rently. Moreover, the election mechanism applies only to
veterans who are *already* eligible for both programs. See
§ 3327(a) (requiring a veteran to be "entitled to basic educa-
tional assistance under [the Montgomery] chapter" *and*
"mee[t] the requirements for entitlement to educational as-
sistance under this [Post-9/11] chapter"). Because a veteran
must already qualify for Post-9/11 benefits, this mechanism
cannot provide a way for veterans who lack Post-9/11 bene-
fits to "convert" their Montgomery benefits. Indeed, the en-
tire point of the election mechanism is to "coordinat[e]" Mont-
gomery and Post-9/11 "entitlement[s]"—*i.e.*, to manage two
existing entitlements. § 3322(d) (cross-referencing § 3327).
More importantly, § 3327(a) does not cabin its application
based upon period of service or separate entitlements. See
*supra*, at 325–326. Rudisill's interpretation ultimately does

not overcome the application of §3327's plain text to his circumstance—he is entitled to both sets of benefits and switched to Post-9/11 benefits when he "ha[d] used, but retain[ed] unused," Montgomery benefits.

The majority, for its part, takes a different tack. Its reasoning seems to rest on the theory that because Rudisill was "entitled" to Montgomery benefits and "entitled" to Post-9/11 benefits, those multiple entitlements cannot be limited when switching between benefits. *Ante,* at 305–306. But, the majority's own reasoning undermines that theory. It agrees that Rudisill cannot receive the full 72 months of benefits he earned because a separate statutory provision limits him to 48 months total. See *ante,* at 306; §3695. And, it agrees that Rudisill cannot use his two separate entitlements concurrently. *Ante,* at 301; §3322(a). This is true even though Rudisill is "entitled" to 36 months of Montgomery benefits and "entitled" to 36 months of Post-9/11 benefits. See §§3011(a), 3311(a). In other words, the majority itself admits that Rudisill's entitlements are not absolute. But, while the majority accepts certain statutory limitations on Rudisill's multiple "entitlements," it rejects others—even ones listed in the same subsection. Indeed, even though the Court agrees that *some* election must be made, it rejects the election process spelled out in the statute to address Rudisill's circumstance. My focus on this election does not "blu[r ] all elections into one," *ante,* at 311, but rather, applies specific statutory text that plainly covers Rudisill.

The majority tries to justify its selective reading of the statute by suggesting that the coordination provision in §3322(d) "simply does not speak to a veteran who just wants to use one of his two separate entitlements." *Ante,* at 309. But that provision specifically governs the "coordination of *entitlement*" to Post-9/11 benefits "on the one hand" and Montgomery benefits "on the other." §3322(d) (emphasis added). It is unclear how a statute could more explicitly cover the interaction between two separate entitlements.

The majority also provides no satisfactory answer for why the concurrent-use bar in §3322(a) applies to Rudisill, but the coordination provision in §3322(d) does not. Both provisions cover veterans who qualify for both sets of benefits, yet the majority applies one but not the other to Rudisill. More fundamentally, the Court agrees that *some* election must be made. See *ante*, at 310. Rather than leave Rudisill to make some uncodified election to switch to Post-9/11 benefits, I would apply the election mechanism that Congress created to cover his circumstance.

The majority's remaining arguments are simply critiques of Congress's policy judgments. The Court calls the Government's reading of the statute's election mechanism "nonsensical" because it requires a veteran to exhaust or forfeit his Montgomery benefits before switching to Post-9/11 benefits. *Ante*, at 313. But, in reality, the election mechanism offers a veteran in Rudisill's circumstance two paths. He may use 48 months of benefits by first using all 36 months of his Montgomery benefits, followed by 12 months of Post-9/11 benefits.[3] Or, he could use 36 months of benefits, with his choice of when to switch from Montgomery to Post-9/11 benefits. It is not "remarkable" for Congress to "include a rule allowing individuals to make a wholly voluntary election to receive a more generous benefit earlier, at a cost." *BO* v. *Wilkie*, 31 Vet. App. 321, 352 (Ct. App. Vet. Cl. 2019) (Bartley, J., dissenting).

In any event, the wisdom of this limitation is not up to this Court. It was for Congress to decide what Post-9/11 benefits a veteran should receive retroactively. As Rudisill acknowledges, the Post-9/11 program is "far more generous" and, accordingly, costs much more than the Montgomery pro-

---

[3] This option arises because once a veteran has used all his Montgomery benefits, he is no longer entitled to multiple sets of benefits, rendering the coordination provision and election mechanism inapplicable. Both of those provisions apply only to a veteran entitled to more than one set of benefits. See §§3322(d), 3327(a).

Thomas, J., dissenting

gram.  Brief for Petitioner 15.  Perhaps the limitation on entitlement reflects a measure to manage this growing cost, given that "[p]assing a law often requires compromise." *NLRB* v. *SW General, Inc.*, 580 U. S. 288, 306 (2017).  Or, perhaps not.  Either way, the limitation is what Congress enacted—whether the majority agrees with its fairness or not—and the text that Congress enacted must dictate the result in this case.

Moving even further away from the text, the majority hints that the veteran's canon could apply if the statute were ambiguous.  *Ante*, at 314.  The veteran's canon directs that "interpretive doubt is to be resolved in the veteran's favor." *Brown* v. *Gardner*, 513 U. S. 115, 118 (1994).  Yet, as the majority recognizes, this canon cannot apply when the statutory text is plain, so it has no role to play here.  More importantly, substantive canons such as the veteran's canon rest on uncertain foundations.  See *Arizona* v. *Navajo Nation*, 599 U. S. 555, 572 (2023) (THOMAS, J., concurring).  I share JUSTICE KAVANAUGH's concern that the veteran's canon "appears to have developed almost by accident," and no explanation has been provided for its foundation.  *Ante*, at 316 (concurring opinion).  I question whether this purported canon should ever have a role in our interpretation.

## IV

The Court holds that, although Rudisill must make some election to switch from his Montgomery to Post-9/11 benefits, the statute's corresponding limits do not apply because it would reduce the amount of available benefits.  In my view, the Court ignores the statutory mechanism that Congress created in favor of an interpretation that reaches a desired outcome.  I respectfully dissent.

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None